No. 93,984

ALEJANDRO CASCO, *Appellant*, v. ARMOUR SWIFT-ECKRICH, *Appellee*.

(154 P.3d 494)

Opinion filed March 23, 2007.

*Jeff K. Cooper,* of Topeka, argued the cause and was on the brief for appellant.

*Mark E. Kolich,* of Lenexa, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: This is a workers compensation case in which the employer, Armour Swift-Eckrich (Armour), has petitioned us to review the decision by the Court of Appeals, which held that the injury to claimant Alejandro Casco's right shoulder was the natural and probable consequence of the work-related injury to his left shoulder. Armour raises two issues: whether the injury to Casco's right shoulder was the natural and probable consequence of the injury to his left shoulder and whether Casco should receive compensation for parallel injuries.

## FACTS

Alejandro Casco, a 56-year-old immigrant from Honduras, began working in sausage production for Armour in 1998. Casco, who is right-handed, suffered a repetitive use injury to his left shoulder on June 8, 2000, due to his employment with Armour. As a result of that injury, Casco underwent two surgeries on his left shoulder to repair a torn rotator cuff. The first surgery occurred in February 2001, and the second surgery occurred 1 year later, in February 2002. Because of the injury to his left shoulder and the restrictions associated with his treatment, Casco began using only his right arm to perform all of his job duties, which included repetitive work tying sausages, placing them in a box, and carrying the 20-to 25-pound box to another location.

Casco began experiencing pain in his right shoulder in August 2002. In January 2003, Dr. Sergio Delgado, a board-certified orthopedic surgeon, diagnosed Casco with impingement syndrome or a possible rotator cuff tear in his right shoulder. In February 2003, Casco appeared before an administrative law judge (ALJ) because Armour denied treatment for his right shoulder. The ALJ ordered Armour to provide treatment for Casco's right shoulder injury. Casco underwent surgery on his right shoulder in April 2003.

Following the surgery on his right shoulder, Casco was off work until October 16, 2003, when his treating physician released him to work with permanent restrictions. Casco returned to Armour on October 17, 2003, and presented his permanent restrictions to Ar-

mour's employment representative, who informed Casco that there were no jobs available within his restrictions. Because Casco had no other means of support, he moved to Maryland to live with his son on October 23, 2003.

Casco received a letter from Armour on November 12, 2003, advising him that it had a position within his restrictions. The letter stated that Casco must report for the position by November 10, 2003, or Armour would consider his absence as a voluntary termination of his employment. Although the date to report had passed by the time Casco received the letter, Casco saved the money necessary to purchase a bus ticket and returned to Kansas. He reported for work at Armour on November 24, 2003, but was denied employment. Armour's employment agent advised Casco that he was too late for the opportunity that was available on November 10 and no other positions were available. Thereafter, Casco returned to Maryland and attempted to find employment within his permanent restrictions. Although he applied for 84 positions, Casco was unable to find any employment.

Dr. Delgado evaluated Casco in November 2003 to establish a permanent impairment rating after Casco achieved maximum medical improvement. Dr. Delgado rated Casco's impairment as 27% for the left upper extremity, 6% for the right upper extremity, and 19% to the whole body. Dr. Delgado issued permanent restrictions requiring Casco to avoid activities that involved pushing or pulling 50 pounds repetitively or 70 pounds occasionally, lifting from the floor over 40 pounds occasionally, lifting from waist to overhead between 5 and 10 pounds occasionally and "zero" pounds repetitively. Dr. Delgado also reviewed a list of tasks performed by Casco in the preceding 15 years and concluded that Casco could no longer perform 10 of the 20 tasks.

Armour retained Terry Cordray, a vocational expert, to assess Casco's ability to access the labor market. Cordray identified 15 tasks that Casco had performed in the previous 15 years and concluded that Casco could no longer perform 43.5% of those tasks because of his restrictions. According to Cordray, Casco could expect entry-level employment as a security guard, cashier, counter or retail clerk, retail salesman, or housekeeper, resulting in a wage

of approximately $7.50 per hour and a wage loss of 37.5%. Cordray's evaluation focused on Casco's physical limitations and did not account for the limitations due to Casco's inability to speak English.

Casco sought compensation for the permanent disability in both of his shoulders. An ALJ heard the matter based on the stipulation that Casco's injuries occurred on June 8, 2000, arose out of his employment with Armour, and were covered by the Workers Compensation Act. Casco testified that, after the surgeries on his left shoulder, he worked solely with his right arm, performing the same work that other employees were performing with two arms. Dr. Delgado testified that the injury to Casco's right shoulder was due to overcompensating for the injury to his left shoulder. No other medical professionals testified.

The ALJ found that Casco "suffers a persistent left shoulder rotator cuff tear and an impingement syndrome to the right shoulder" and that the "right impingement syndrome is attributable to the overuse of that extremity due to compensation for the injury to the left shoulder." Relying on Dr. Delgado's undisputed testimony, the ALJ found that Casco's "right upper extremity injury is the natural and probable consequence of the left upper extremity injury" and Casco has a whole person impairment. The ALJ further relied on Dr. Delgado's testimony to find that Casco suffered a 19% whole person functional impairment. The ALJ averaged the percentage of task loss as determined by Dr. Delgado and Terry Cordray and found that Casco has a 39% task loss. Considering Casco's wage loss to be 100%, the ALJ determined that Casco had a 69.5% work disability. The ALJ awarded Casco the following: The Claimant is entitled to 46.14 weeks' temporary total disability compensation at the rate of $321.31 per week or $14,825.24 and 72.93 weeks at the rate of $321.31 per week or $23,433.14, for a 19% permanent partial general bodily disability and as of October 17, 2003, 193.85 weeks at the rate of $354.72 or $68,762.47 for a 69.5% work disability, making a total award as limited by K.S.A. 44-510f of $100,000.

Armour appealed the ALJ's award to the Workers Compensation Board (Board). The Board rejected the ALJ's conclusion that

Casco's right shoulder injury was the natural and probable consequence of his left shoulder injury. Concluding that Casco suffered a new and separate accident to his right shoulder due to repetitive use, the Board calculated Casco's compensation based on the schedule in K.S.A. 44-510d. Although the Board found that Casco suffered two separate accidental injuries on two separate dates, it relied on the parties' stipulation regarding the date of injury and calculated Casco's award for both injuries based on the same date of injury. The Board awarded Casco 46.14 weeks of temporary total disability at the rate of $321.31 per week, or $14,825.24, and 48.29 weeks of permanent partial disability at the rate of $321.31 per week, or $15,516.06, for a total award of $30,341.30 for the 27% permanent partial disability to his left upper extremity. The Board further awarded Casco 13.5 weeks of permanent partial disability at a rate of $321.31 per week, or $4,337.69, for the 6% permanent partial disability to his right upper extremity.

Casco appealed the Board's decision to the Court of Appeals, which reversed the Board's decision. *Casco v. Armour Swift-Eckrich*, 34 Kan. App. 2d 670, 128 P.3d 401 (2005). The Court of Appeals concluded that the Board ignored Dr. Delgado's undisputed medical testimony regarding the causation of Casco's right shoulder injury and held that the award should be based on injuries to parallel limbs. 34 Kan. App. 2d at 682-83. Armour then petitioned us to review the Court of Appeals' decision, and we granted Armour's petition.

## ANALYSIS

The first question we address is whether the injury to Casco's right shoulder is a necessary and probable consequence of the injury to his left shoulder. Armour claims that the injury to Casco's right shoulder is a new injury, so Casco's compensation should be calculated as a scheduled injury pursuant to K.S.A. 44-510d. Casco asserts that the Court of Appeals is correct in concluding that his right shoulder injury was caused by his left shoulder injury.

*Standard of Review*

Before analyzing the parties' arguments, we must begin by setting forth the standard of review. K.S.A. 2005 Supp. 44-556(a) gives us jurisdiction to review decisions by the Board in accordance with the Act for Judical Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq*. Appellate courts may only review the Board's decisions upon questions of law. K.S.A. 2005 Supp. 44-556(a).

The KJRA limits the scope of appellate review to the following: The court shall grant relief only if it determines any one or more of the following:

"(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

"(2) the agency has acted beyond the jurisdiction conferred by any provision of law;

"(3) the agency has not decided an issue requiring resolution;

"(4) the agency has erroneously interpreted or applied the law;

"(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

"(6) the persons taking the agency action were improperly constituted as a decision-making body or subject to disqualification;

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious." K.S.A. 77-621(c).

An appellate court reviews the Board's factual findings to determine whether they are supported by substantial evidence "when viewed in light of the record as a whole." K.S.A. 77-621(c)(7); accord *Titterington v. Brooke Insurance*, 277 Kan. 888, 894, 89 P.3d 643 (2004). A review of the Board's factual findings is a question of law. In a workers compensation case, substantial evidence is evidence of substance and relevant consequence, carrying a fitness to induce conviction that the award is proper or furnishing a substantial basis of fact for reasonably resolving the issue. An appellate court reviews the evidence in a light most favorable to the prevailing party without reweighing the evidence or redetermining the

credibility of witnesses. We will uphold the Board's findings even though there is evidence in the record to support contrary findings. 277 Kan. at 894-95. However, a factfinder cannot disregard undisputed evidence that is not improbable, unreasonable, or untrustworthy. Such evidence must be regarded as conclusive. *Demars v. Rickel Manufacturing Corp.*, 223 Kan. 374, 380, 573 P.2d 1036 (1978); *Overstreet v. Mid-West Conveyor Co., Inc.*, 26 Kan. App. 2d 586, 589, 994 P.2d 639 (1999).

In addition to reviewing the Board's factual findings, an appellate court can determine whether the Board reached the appropriate legal conclusion based on its findings. K.S.A. 77-621(c)(4); *Frazier v. Mid-West Painting, Inc.*, 268 Kan. 353, 358, 995 P.2d 855 (2000). In *Frazier*, the claimant suffered a repetitive use injury to his right forearm and shoulder. While undergoing treatment in a work-hardening program, the claimant permanently aggravated a preexisting back condition. The Board found that the injury to the claimant's back occurred during the work-hardening program but concluded that the back injury was a separate injury wholly unrelated to his right forearm injury. This court agreed with the Board's factual findings but reversed the Board's conclusion. Because the work-hardening program was required to treat the claimant's right forearm and shoulder injury, the *Frazier* court concluded that the aggravation of the claimaint's back condition was a natural and probable consequence of the claimant's right forearm and shoulder injury. 268 Kan. at 358. Thus, when the Board has reached the wrong legal conclusion based on an erroneous application of the law, we have jurisdiction to reverse the Board's decision. See K.S.A. 77-621(c)(4).

## Secondary Injury Rule

Like *Frazier*, the issue in this case involves the application of the secondary injury rule, which was first articulated by this court in *Jackson v. Stevens Well Services*, 208 Kan. 637, 493 P.2d 264 (1972). The secondary injury rule allows a claimant to receive compensation for all of the natural consequences arising out of an injury, including any new and distinct injuries that are the direct and natural result of the primary injury. 208 Kan. at 643. In *Jackson*, a

22-foot pipe dropped onto the claimant's hands, causing the amputation of two fingers and part of the thumb on his right hand and one finger on his left hand. Several months later, the claimant began experiencing pain in his right shoulder, limiting the movement of his right arm. Because of the disability in his hands and shoulder, the claimant was totally disabled from obtaining or retaining the same kind of employment. The *Jackson* court included the secondary shoulder disability in determining the claimant's award for the primary injury to his hands, concluding that the claimant had suffered a general body disability rather than a scheduled injury. 208 Kan. at 644.

One year later, this court limited the application of the secondary injury rule in *Stockman v. Goodyear Tire & Rubber Co.*, 211 Kan. 260, 505 P.2d 697 (1973). The claimant in *Stockman* injured his back at work. After 4 months of treatment, the claimant was released to return to work. The day after the claimant returned to work, he reached down to pick up a tire at home and hurt his back again, causing him to miss work for another 5 months. The *Stockman* court held that the claimant was not entitled to compensation for the second injury to his back because it was a new and separate injury, stating that "[t]he rule in *Jackson* is limited to the results of one accidental injury. The rule was not intended to apply to a new and separate accidental injury such as occurred in the instant case." 211 Kan. at 263.

The question of whether an injury results from a new and separate accident depends on the facts in each case. When there is expert medical testimony linking the causation of the second injury to the primary injury, the second injury is considered to be compensable as the natural and probable consequence of the primary injury. See *Frazier*, 268 Kan. at 355; *Makalous v. Kansas State Highway Commission*, 222 Kan. 477, 480-81, 486, 565 P.2d 254 (1977) (intimal hemorrhage in claimant's coronary artery resulting from being hit with a post during extremely cold weather caused claimant to have a heart attack 3 months later); *Gillig v. Cities Service Gas Co.*, 222 Kan. 369, 564 P.2d 548 (1977) (torn cartilage in claimant's knee from 1973 injury caused the knee to lock in 1975, requiring surgery); *Chinn v. Gay & Taylor, Inc.*, 219 Kan. 196,

201, 547 P.2d 751 (1976) (injury to claimant's knee caused change in posture and gait which resulted in a disability in claimant's back); *Reese v. Gas Engineering & Construction Co.*, 219 Kan. 536, 540-41, 548 P.2d 746 (1976) (injury to claimant's leg caused compensable disability in claimant's back and other leg); *Bergemann v. North Central Foundry, Inc.*, 215 Kan. 685, 686-87, 689, 527 P.2d 1044 (1974) (severe crush injury to claimant's foot caused disability in claimant's back); *Jackson*, 208 Kan. at 643; *Logsdon v. Boeing Co.*, 35 Kan. App. 2d 79, 128 P.3d 430 (2006) (injury to claimant's shoulder in 1993 caused it to dislocate when he slipped and fell in 2004); *Woodward v. Beech Aircraft Corp.*, 24 Kan. App. 2d 510, 512-13, 949 P.2d 1149 (1997) (twisting injury to claimant's left knee caused overuse of right knee and aggravated a preexisting condition, causing disability in claimant's right knee); *Wall v. Gage Bowl, Inc.*, No. 89,350, unpublished Court of Appeals opinion filed April 18, 2003 (injury to claimant's left elbow caused overuse injury to right arm). *Cf. Weitharn v. Safeway Stores, Inc.*, 16 Kan. App. 2d 188, 820 P.2d 719, *rev. denied* 250 Kan. 808 (1991) (doctor's notes indicated that claimant's back pain was unrelated to his knee injury); *Banks v. U.S. Engineering Co.*, No. 94,789, unpublished Court of Appeals opinion filed Feb. 17, 2006 (injury to claimant's left knee was not a natural and probable consequence of the injury to claimant's right knee based on medical testimony to that effect).

In this case, the Board found that Casco returned to work, performing his work duties using only his right arm because of the injury to his left shoulder. The Board specifically noted the following portion of Casco's testimony:

"Since I had the—my restrictions on my left arm, then I had to do all the work with my right arm. I was doing the work—I was having to do repetitive movement with my right arm—with my right hand in order to tie up the meat. I then had to—after that container would fill up, I then had to pick it up with my right arm and take it to a specific place. I would hold it with my right arm and then put it against my side in order to take it to a specific place."

The Board also noted Dr. Delgado's opinion that Casco's right shoulder problems were due to overuse because he was compensating for his left arm, quoting the following portion of Dr. Delgado's testimony:

" 'Q. [Armour's counsel] Okay. Now Doctor, with regard to the right shoulder I think you've indicated that you feel that the shoulder became injured because he was over compensating [*sic*] for the other shoulder. Is that true?
" 'A. (Dr. Delgado). That is very frequently seen where when there's limitation of motion, weakness or pain, the other shoulder is overloaded if he continues to do the same activities as before or similar to them.
" 'Q. And when you say same activities, you are specifically referring to his work activities, is that true?
" 'A. Yes.
" 'Q. Because would it be fair to assume if he wasn't doing the work activities, there would be nothing to cause an injury to that right shoulder, would there?
" 'A. That would be correct.' "

We note that these factual findings are supported by substantial evidence. However, the Board's conclusion that Casco suffered a new and separate injury to his right arm fails to consider all of the evidence. After acknowledging Casco's testimony that he was working solely with his right arm because of the restrictions for his left arm, the Board focused on Casco's testimony that he was doing repetitive work with his right arm. Specifically, the Board failed to consider Casco's uncontradicted testimony that he was carrying boxes weighing between 20 and 25 pounds with one arm while other employees were using two arms to carry the same load. Because this evidence is not unreasonable, improbable, or untrustworthy, we consider it to be conclusive. See *Demars*, 223 Kan. at 380. The conclusion that Casco injured his right arm by carrying 20-to 25-pound boxes with only his right arm is more consistent with Dr. Delgado's testimony regarding Casco overcompensating rather than the Board's conclusion that Casco's right shoulder injury was caused by repetitive use.

Likewise, the Board's conclusion places undue emphasis on Dr. Delgado's reference to Casco's work activities rather than his expert opinion linking the causation of Casco's right shoulder injury to his left shoulder injury. The Board's emphasis on Casco's work activities is the basis for Armour's first argument to this court. Armour argues that the secondary injury rule only applies to new and distinct disabilities that result from the performance of routine daily activities excluding any work-related activities. Thus, under Armour's argument, Casco could claim that his right shoulder in-

jury was a secondary injury if the overcompensation had occurred during his daily, nonwork-related activities.

To support this argument, Armour cites *Chinn v. Gay & Taylor, Inc.*, 219 Kan. 196, 547 P.2d 751 (1976), for the proposition that the claimant's award for a secondary injury was not related to his work activities. However, Armour's reliance on *Chinn* is misplaced. In *Chinn*, the claimant was employed as a traveling salesman. Chinn twisted and injured his left knee when he stepped out of a company car. Chinn continued to work, but walked with a limp. A few weeks later he developed pain in his back. Several months later, Chinn underwent surgery on his left knee. Chinn's medical treatment extended for over 1 year. After his treatment was complete, Chinn continued to have trouble with his knee, causing him to limp especially after sitting down or driving long distances. As a traveling salesman, Chinn was required to drive long distances, so his back problems were directly related to his work activities, not just his nonwork-related activities. Thus, *Chinn* does not support Armour's argument.

Armour cites no other authority to support its argument that the secondary injury rule only applies when the secondary injury results from nonwork-related activities. Our analysis of secondary injury case law reveals that Armour's argument lacks merit. See *Frazier*, 268 Kan. at 356 (stating that the claimant's treatment included a work-hardening program which simulated work activities); *Gillig*, 222 Kan. at 370-71 (noting that clamaint's secondary injury occurred while he was working); *Woodward*, 24 Kan. App. 2d at 511 (observing that claimant returned to work and began favoring his injured knee).

Armour further argues that the secondary injury rule is unnecessary if the employee suffers from another disability related to his or her work. According to Armour, the employee can seek compensation for the new injury under the Workers Compensation Act regardless of the prior injury. This argument also lacks merit. As demonstrated by *Frazier*, a claimant's compensation may be affected by the application of the secondary injury rule. In *Frazier*, the claimant stipulated that he had not notified his employer of the aggravating injury to his back within the statutory time limits. The

aggravating injury to his back occurred while the claimant was participating in a work-hardening program for an injury to his right arm. The *Frazier* court concluded that the claimant's back injury resulted from the treatment for his right arm injury and applied the secondary injury rule. If the secondary injury rule had not applied, the claimant's failure to timely notify his employer of the back injury would have precluded compensation. 268 Kan. at 358. Thus, the application of the secondary injury rule may be a necessary component in properly calculating a claimant's compensation award. We are not persuaded by Armour's argument to the contrary.

Finally, Armour contends that the Court of Appeals applied the wrong standard of review and should have affirmed the Board's decision because it was supported by substantial competent evidence. The Court of Appeals concluded that the Board ignored the causation evidence from Dr. Delgado's testimony. We agree with the Court of Appeals. The Board's decision also fails to consider the uncontroverted evidence that Casco was carrying 20-to 25-pound boxes with only his right arm because he could not use his left arm. K.S.A. 77-621(c)(7) gives us authority to reverse the Board's decision when it is based on a determination of fact that is not supported by the evidence in the record. The Board's factual determination that Casco suffered an injury to his right shoulder due to repetitive use is not supported by the evidence in the record.

Likewise, K.S.A. 77-621(c)(4) gives us jurisdiction to reverse the Board's legal conclusions when the Board erroneously interprets or applies the law. See, *e.g.*, *Frazier*, 268 Kan. at 358; *Demars*, 223 Kan. at 380. The Board's legal conclusion that Casco suffered a new and separate injury places undue emphasis on Dr. Delgado's testimony regarding Casco's work activities without considering Dr. Delgado's testimony linking the injury to Casco's right shoulder with the injury to his left shoulder. As a result, the Board's conclusion erroneously interpreted and applied the secondary injury rule.

The record contains uncontroverted evidence establishing that the injury to Casco's right shoulder was caused by overcompensating for the injury to his left shoulder. Based on this evidence

and the secondary injury rule, we hold that the injury to Casco's right shoulder is a direct and natural consequence of the injury to his left shoulder. Because the Board ignored this uncontroverted evidence and incorrectly interpreted and applied the secondary injury rule, we reverse the Board's decision and affirm the Court of Appeals.

*Parallel Injuries*

The next issue involves the calculation of Casco's award. In addition to concluding that the secondary injury rule applies, the Court of Appeals also held that Casco's award should be based on injuries to parallel limbs. Although the Court of Appeals did not specify what the calculation should be, it implied that the ALJ's award for permanent partial general disability is correct. 34 Kan. App. 2d at 682-83. Armour argues that scheduled injuries are the rule and that the Court of Appeals has improperly broadened the exceptions to the rule.

The Workers Compensation Act dictates the calculation of a claimant's award. As a result, the calculation of Casco's award requires us to interpret the statutes. Pursuant to K.S.A. 2005 Supp. 44-556(a) and K.S.A. 77-621(c)(4), we have jurisdiction to review the interpretation of a statute in workers compensation cases. The interpretation of a statute is a question of law, over which this court has unlimited review. The Board's interpretation of the law is entitled to judicial deference if there is a rational basis for the Board's interpretation. However, the Board's interpretation is not conclusive and, though persuasive, is not binding on this court. *Foos v. Terminix*, 277 Kan. 687, 692-93, 89 P.3d 546 (2004).

When construing statutes, we are required to give effect to the legislative intent if that intent can be ascertained. When a statute is plain and unambiguous, we must give effect to the legislature's intention as expressed, rather than determine what the law should or should not be. *Foos*, 277 Kan. at 695. A statute should not be read to add that which is not contained in the language of the statute or to read out what, as a matter of ordinary language, is included in the statute. *Neal v. Hy-Vee, Inc.*, 277 Kan. 1, 15, 81 P.3d 425 (2003).

The Workers Compensation Act calculates compensation differently depending on the nature of the disability. K.S.A. 44-510c provides compensation for temporary and permanent *total* disabilities. K.S.A. 44-510d and 44-510e provide compensation for permanent *partial* disabilities. K.S.A. 44-510d calculates the award based on a schedule of disabilities. If an injury is on the schedule, the amount of compensation in the schedule includes compensation for the complete loss of the member or the partial loss of the member. K.S.A. 44-510d(a)(21). The compensation for a scheduled disability is based on the schedule alone without regard to the claimant's loss in earning power. *Stephenson v. Sugar Creek Packing*, 250 Kan. 768, 771, 830 P.2d 41 (1992). K.S.A. 44-510e, on the other hand, calculates the award for any injury not included on the schedule. A claimant with a permanent partial general disability pursuant to K.S.A. 44-510e is eligible to receive temporary total disability in addition to the compensation he or she may receive for the permanent partial disability. K.S.A. 44-510c(c); K.S.A. 44-510e.

The parallel injury rule referred to by the Court of Appeals originated with *Honn v. Elliott*, 132 Kan. 454, 295 Pac. 719 (1931). In *Honn*, the claimant worked as a rig builder in the oil fields. Honn injured both of his feet when he fell approximately 20 feet from an oil rig. Honn sustained a permanent partial loss of use for both of his feet, with one foot bearing a 45% loss of use and the other foot bearing a 40% loss of use. Honn's injuries precluded him from building oil rigs, any work that required climbing ladders, any work that required him to move quickly, or any work that required him to be on his feet much of time.

The 1927 version of the workers compensation code applied to Honn's injuries and contained compensation provisions similar to those included in the current version of the code. The applicable section for calculating compensation for any disability not resulting in death was R.S. 1923, 44-510(3) (1930 Supp.), which contained subsections for permanent total disability, R.S. 1923, 44-510(3)(a) (1930 Supp.); temporary total disability, R.S. 1923, 44-510(3)(b)

(1930 Supp.); permanent partial disability based on scheduled injuries, R.S. 1923, 44-510(3)(c) (1930 Supp.); and permanent partial general disability for injuries not included on the schedule, R.S. 1923, 44-510(3)(c)(22) (1930 Supp.) Although the schedule included compensation for the loss of a foot, the *Honn* court concluded that Honn's award should be calculated as a permanent partial disability rather than as separate scheduled injuries. 132 Kan. at 458. The *Honn* court noted that the language in R.S. 1923, 44-510(3)(c)(1)-(20) (1930 Supp.), which established the schedule for injuries, did not specifically provide for compensation when both members were injured in pairs. The *Honn* court then looked to R.S. 1923, 44-510(3)(a) (1930 Supp.), which addressed *permanent total disability*, observed that the subsection included language regarding the loss of " 'both eyes, both hands, both arms, both feet, or both legs,' " and applied that language to R.S. 1923, 44-510(3)(c) (1930 Supp.) because the schedule did not specifically reference injuries to parallel members. 132 Kan. at 458. The rule resulting from *Honn*, referred to here as the parallel injury rule, provides that a claimant may receive compensation based on a permanent partial general disability rather than scheduled injuries if the claimant simultaneously injures parallel members.

Since *Honn* was decided in 1931, several cases have addressed the parallel injury rule. In the majority of those cases, this court concluded that the parallel injury rule from *Honn* did not apply. See, *e.g.*, *Pruter v. Larned State Hospital*, 271 Kan. 865, 875, 26 P.3d 666 (2001) (calculating compensation for claimant's simultaneous wrist and ankle injuries as scheduled injuries); *Crouse v. Wallace Manufacturing Co.*, 207 Kan. 826, 486 P.2d 1335 (1971) (refusing to apply *Honn* because the injuries did not occur at the same time); *Wammack v. Root Manufacturing Co.*, 184 Kan. 367, 371-72, 336 P.2d 441 (1959) (holding that injuries to both thumbs are scheduled injuries because thumbs do not appear on the list of parallel members); *Stanley v. United Iron Works Co.*, 160 Kan. 243, 256-57, 160 P.2d 708 (1945) (concluding that compensation for the permanent partial loss of hearing in both ears and the partial loss of sight in one eye is calculated based on scheduled injuries); *Hurst v. Independent Construction Co.*, 136 Kan. 583, Syl. ¶ 2, 16

P.2d 540 (1932) (refusing to apply the parallel injury rule to simultaneous injuries in both of the claimant's feet because one foot had completely healed); *Rodriguez v. Henkle Drilling & Supply Co.*, 16 Kan. App. 2d 728, 731, 828 P.2d 1335, *rev. denied* 251 Kan. 939 (1992) (denying application of *Honn* because the injuries to claimant's knee and arm did not occur at the same time).

However, a few cases have extended the *Honn* parallel injury rule. See, *e.g.*, *Hardman v. City of Iola*, 219 Kan. 840, 844-45, 549 P.2d 1013 (1976) (calculating claimant's award for injuries to both hands as permanent partial general disability rather than scheduled injuries); *Murphy v. IBP, Inc.*, 240 Kan. 141, 144-45, 727 P.2d 468 (1986) (extending the holding in *Honn* to repetitive use injuries in claimant's hands and arms even when the injuries are not manifested simultaneously); *Downes v. IBP, Inc.*, 10 Kan. App. 2d 39, 40-41, 691 P.2d 42 (1984), *rev. denied* 236 Kan. 875 (1985) (applying the holding in *Honn* to repetitive use injuries to claimant's carpal tunnel injuries to her hands and wrists).

The legislature has amended the workers compensation code since *Honn* was decided. One of the key modifications in the code is the division of the three types of compensation for permanent disabilities into separate statutes. R.S. 1923, 44-510(3)(a) and (b) (1930 Supp.) has become K.S.A. 44-510c, which addresses permanent and temporary total disability. R.S. 1923, 44-510(3)(c) (1930 Supp.) has become K.S.A. 44-510d, which addresses permanent partial scheduled disabilities. R.S. 1923, 44-510(3)(c)(22) (1930 Supp.) has become K.S.A. 44-510e, which addresses permanent partial general disabilities, or nonscheduled partial disabilities. The division of the prior subsections of R.S. 1923, 44-510(3) (1930 Supp.) into separate statutes emphasizes the distinction between the different types of compensation and the legislature's intent to treat each type of compensation differently.

Casco relies on the parallel injury rule from *Honn* for his assertion that the ALJ properly calculated his compensation as a permanent partial general body disability under K.S.A. 44-510e. However, our analysis reveals that Casco's reliance on *Honn* is misplaced because *Honn* is in error. The *Honn* court improperly

interpreted R.S. 1923, 44-510(3) (1930 Supp.). The *Honn* court grafted language applicable to permanent *total* disabilities from subsection (a) into subsection (c), which applied to permanent *partial* disabilities. R.S. 1923, 44-510(3)(a) (1930 Supp.) provided a presumption for permanent total disability, stating:

"Loss of both eyes, both hands, both arms, both feet or both legs, shall, in the absence of proof to the contrary, constitute a total permanent disability."

Although, R.S. 1923, 44-510(3)(c) (1930 Supp.), which applied to permanent partial disability, did not include the same language, the *Honn* court used this language to conclude that the legislature did not intend for the schedule to apply when a claimant simultaneously injured parallel limbs. 132 Kan. at 458. The *Honn* court's statutory interpretation failed to distinguish between permanent *total* disability and permanent *partial* disability.

The *Honn* court's interpretation of the statute did not follow a key tenet of statutory construction—courts cannot add something to a statute that is not readily found in the language of the statute. *Neal*, 277 Kan. at 15. This error in grafting language from subsection (a) into subsection (c) is more apparent now that the subsections of R.S. 1923, 44-510(3) (1930 Supp.) have been divided into separate statutes. Neither of the statutes applicable to permanent *partial* disability includes language regarding the loss of both eyes, both hands, both arms, both feet, or both legs, or any combination thereof. See K.S.A. 44-510d; K.S.A. 44-510e.

In *Pruter v. Larned State Hospital*, 271 Kan. 865, 26 P.3d 666 (2001), this court set forth the proper analytical procedure for calculating a claimant's award when the claimant has a loss of both eyes, both hands, both arms, both feet, or both legs or any combination thereof. In *Pruter*, the claimant broke her right wrist and left ankle simultaneously when she fell at work. The ALJ determined that Pruter suffered a 6% impairment to her right upper extremity and a 7% impairment to her right lower extremity, converted those findings to a 7% functional impairment, and calculated Pruter's award as a nonscheduled injury. The Court of Appeals reversed Pruter's award, concluding that it should have been calculated as two separate scheduled injuries. See 271 Kan. at 867.

On appeal to this court, Pruter argued that her simultaneous injuries to her arm and leg should be compensated as a permanent partial general disability based on *Honn* and a 1959 amendment to K.S.A. 44-510(3)(a), which included any combination of an eye, hand, arm, foot, or leg. Pruter also argued that nonscheduled injuries are the general rule.

Contrary to Pruter's argument, the *Pruter* court concluded that scheduled injuries are the general rule and nonscheduled injuries are the exception. However, the *Pruter* court agreed with Pruter that the 1959 amendment extended the presumption for permanent total disability to any combination of injuries to an eye, hand, arm, foot, or leg. 271 Kan. at 873, 875. Based on these conclusions, the *Pruter* court determined that Pruter's combination of injuries to her right arm and right leg "should have been presumed to constitute a permanent total disability, consistent with the reasoning in *Honn*" and pursuant to K.S.A. 44-510c(a)(2) (formerly K.S.A. 44-510[3][a]). 271 Kan. at 875. However, the *Pruter* court then considered the language in K.S.A. 44-510c(a)(2) in context. The relevant part of K.S.A. 44-510c(a)(2) provides:

"Permanent total disability exists when the employee, on account of the injury, *has been rendered completely and permanently incapable of engaging in any type of substantial and gainful employment.* Loss of both eyes, both hands, both arms, both feet, or both legs, or any combination thereof, *in the absence of proof to the contrary,* shall constitute a permanent total disability." (Emphasis added.)

Noting that Pruter sustained relatively minor injuries, this court concluded that Pruter's injuries did not cause permanent total disability by leaving her "completely and permanently incapable of engaging in any type of substantial and gainful employment" as required by K.S.A. 44-510c(a)(2). 271 Kan. at 875. As a result, the *Pruter* court held that Pruter's claim should be calculated as separate scheduled injuries pursuant to K.S.A. 44-510d. 271 Kan. at 876.

Although the *Pruter* court did not state that it was overruling *Honn*, its analysis effectively rejected it. The *Honn* court failed to address evidence that Honn was actually employed after receiving his injuries, indicating that he was capable of performing some work, thereby rebutting the statutory presumption that he was per-

manently and totally disabled. See R.S. 1923, 44-510(3)(a) (1930 Supp.) (providing: "Loss of both eyes, both hands, both arms, both feet, or both legs, shall, *in the absence of proof to the contrary,* constitute a total permanent disability." [Emphasis added.]). Unlike the *Honn* court, the *Pruter* court properly applied the rebuttable presumption of permanent total disability in K.S.A. 44-510c(a)(2) to determine the nature of Pruter's injury as a preliminary step rather than a final step in its analysis. After concluding that Pruter's injuries did not cause a total, permanent disability, the *Pruter* court proceeded to the statutes applicable to permanent partial disability, K.S.A. 44-510d and K.S.A. 44-510e. Because K.S.A. 44-510d is the general rule and an injury to a wrist (forearm) and an ankle (lower leg) are included on the schedule, the *Pruter* court did not have to consider K.S.A. 44-510e, which only applies to injuries not covered by the schedule. *Pruter,* 271 Kan. at 873, 876; see also K.S.A. 44-510d(a)(18) (defining forearm as the area from the wrist to below the elbow, and lower leg as the area from the ankle to below the knee).

The *Honn* parallel injury rule shortcuts the analytical process for calculating a claimant's compensation and contravenes the legislature's intent to make scheduled disabilities the general rule for permanent partial disabilities. The Workers Compensation Act calculates compensation for injured workers in a specific and sequential manner, their order defined by statute as precisely as the four bases on a major league baseball diamond. *Honn* essentially allows the claimant, after successfully reaching first base, to be waved home and exempted from traversing to second and third bases, thus improperly converting a single into a home run. Neither baseball nor the law can allow such flouting of the rules to be permitted, and therefore *Honn's* dubious "homer" cannot continue to be deemed valid in the record books. In brief, shortcutting is one thing; short-changing the law is quite another. Although the *Pruter* court declined to explicitly overrule *Honn* and its progeny as it relates to the parallel injury rule, we do so today.

*Pruter* established the proper analysis for calculating compensation when the claimant has a loss of both eyes, both hands, both arms, both feet, or both legs, or any combination thereof. The

analysis begins with a determination of whether the claimant has suffered a permanent total disability. K.S.A. 44-510c(a)(2) establishes a rebuttable presumption in favor of permanent total disability when the claimant experiences a loss of both eyes, both hands, both arms, both feet, or both legs, or any combination thereof. If the presumption is not rebutted, the claimant's compensation must be calculated as a permanent total disability in accordance with K.S.A. 44-510c. *Pruter*, 271 Kan. at 875-76.

If the presumption of permanent total disability is rebutted with evidence that the claimant is capable of engaging in any type of substantial and gainful employment, the claimant's award must be calculated as a permanent partial disability. See K.S.A. 44-510c(a)(2); *Pruter*, 271 Kan. at 875-76. Although both K.S.A. 44-510d and K.S.A. 44-510e apply to permanent partial disability, we note that eyes, hands, arms, feet, and legs are all included in the schedule. See K.S.A. 44-510d(a)(11)-(17). Because the legislature has made the schedule of injuries the general rule and permanent partial general disability the exception to the rule, the claimant's compensation must be calculated in accordance with the K.S.A. 44-510d for scheduled injuries. See, *e.g.*, *Pruter*, 271 Kan. at 876.

As a result of the disability in both of his shoulders, Casco has lost function in both of his arms, implicating K.S.A. 44-510c, which provides:

"Permanent total disability exists when the employee, *on account of the injury*, has been rendered completely and permanently incapable of engaging in any type of substantial and gainful employment. Loss of both eyes, both hands, both arms, both feet, or both legs, or any combination thereof, in the absence of proof to the contrary, shall constitute a permanent total disability." (Emphasis added.) K.S.A. 44-510c(a)(2).

The language in K.S.A. 44-510c(a)(2) requires that the disability result from a single injury. Here, that condition is satisfied by the application of the secondary injury rule. Because the injury to Casco's right shoulder is a natural and probable consequence of the injury to his left shoulder, we conclude that the disability in both of his arms is the result of a single injury.

When a single injury causes the claimant to suffer the loss of both eyes, both hands, both arms, both feet, both legs, or any com-

bination thereof, we apply the *Pruter* analytical model. Our analysis begins with determining whether Casco is permanently and totally disabled. See *Pruter*, 271 Kan. at 875. Because Casco suffers from the loss of both arms, K.S.A. 44-510c(a)(2) establishes a rebuttable presumption that he is permanently, totally disabled. If that presumption is not rebutted by evidence in the record, Casco's compensation must be calculated in accordance with K.S.A. 44-510c as a permanent total disability.

The Board did not make any findings regarding Casco's capability for engaging in any type of substantial and gainful employment. Although two vocational experts testified that Casco could possibly earn between $6 and $8 per hour, Casco testified that he had contacted 84 prospective employers and had not been able to find any employment within his restrictions. Based on this evidence, the ALJ found that Casco had made a good faith effort to find a job and imputed a 100% wage loss. However, the ALJ, like the Board, did not make any findings regarding whether Casco was completely and permanently incapable of engaging in any type of substantial and gainful employment.

Because the evidence regarding Casco's ability to find any type of substantial and gainful employment is controverted and there are no factual findings to review, we remand the matter to the ALJ to make the necessary findings. If the ALJ finds that Casco is incapable of engaging in any type of substantial and gainful employment, his compensation must be calculated based on K.S.A. 44-510c as a permanent total disability. If the ALJ finds that Casco is capable of engaging in some type of substantial and gainful employment, his compensation must be calculated as two scheduled injuries pursuant to 44-510d.

We affirm the Court of Appeals opinion regarding the application of the secondary injury rule and the findings of parallel injuries. The case is remanded to the ALJ for further proceedings in accordance with this opinion.

LUCKERT, J., not participating.

LOCKETT, J., Retired, assigned.